## THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NORTH CAROLINA EASTERN DIVISION
### No. 4:21-cv-91

| | | |
|---|---|---|
| JOSHUA ARNOLD, | ) | |
| JOSHUA BRONER, | ) | |
| ROBERT CLEMENT, | ) | |
| THOMAS DEBATT, | ) | |
| AUSTIN EUBANKS, | ) | |
| GAUTHIER KABENGELE, | ) | |
| MATTHEW LAMBERT, and | ) | |
| BRANDON MARSTELLER, | ) | |
| | ) | |
|     Plaintiffs; | ) | COMPLAINT |
| | ) | |
|     vs. | ) | |
| | ) | |
| TRADEWIND FLIGHT SERVICES, INC., | ) | |
| ONVOI, LLC, D2 GOVERNMENT | ) | |
| SOLUTIONS, LLC, | ) | |
| DARRYL CENTANNI, | ) | |
| DAVID RICKER, WALLY CALABRESE, | ) | |
| and THE TRUSTEES OF CRAVEN | ) | |
| COMMUNITY COLLEGE; | ) | |
| | ) | |
|     Defendants. | ) | |
| _____ | ) | |

NOW COME Plaintiffs Joshua Arnold, Robert Clement, Thomas DeBatt,

Austin Eubanks, Gauthier Kabengele, Matthew Lambert, and Brandon Marsteller,

complaining of Defendants Tradewind Flight Services, Inc. ("TFSI"), Onvoi, LLC

1

("Onvoi"), D2 Government Solutions, LLC ("D2"), Darryl Centanni ("Centanni");
David Ricker ("Ricker"), Wally Calabrese ("Calabrese"), and The Trustees of
Craven Community College ("Craven"), collectively "Defendants." Plaintiffs
allege and claim as follows:

## I. NATURE OF THE ACTION

This is an action against Defendants for false and misleading representations
and omissions to current and prospective Craven students regarding Defendants'
noncompliance with Federal Aviation Administration ("FAA") regulations and
certifications to operate a pilot training program in accordance with FAA Part 141,
Federal Aviation Regulations ("FAR"). If Defendants had complied with their
obligations, it would have resulted in students not enrolling in the pilot training
program, and Defendants would have incurred substantial financial losses.
Moreover, Defendants specifically targeted Veterans for enrollment in the program
in order to access Veterans Administration ("VA") benefits, even though the
program was not VA approved. Defendants' actions have caused serious harm to
the students they defrauded, particularly those who are Veterans and were already
suffering from disorders related to stress, anxiety and depression.

## II. PARTIES AND JURISDICTION

1. Joshua Arnold ("Arnold") is an adult resident of the State of North Carolina.

2. Joshua Broner ("Broner") is an adult resident of the State of North Carolina.

2

3.  Robert Clement ("Clement") is an adult resident of the State of North Carolina.

4.  Thomas DeBatt ("DeBatt") is an adult resident of the State of North Carolina.

5.  Austin Eubanks ("Eubanks") is an adult resident of the State of North Carolina.

6.  Gauthier Kabangele ("Kabangele") is an adult resident of the State of North Carolina.

7.  Matthew Lambert ("Lambert") is an adult resident of the State of North Carolina.

8.  Brandon Marsteller ("Marsteller") is an adult resident of the State of North Carolina.

9.  Tradewind Flight Services, Inc. ("TFSI"), is a North Carolina corporation with a principal place of business in New Bern, Craven County, North Carolina.

10. Onvoi, LLC ("Onvoi"), was formed as a Mississippi limited liability company in 2015, and was dissolved by resolution of its owners on 1 December 2019.

11. Onvoi filed Articles of Dissolution with the Mississippi Secretary of State on or about 20 March 2020.

12. Onvoi is currently registered as a foreign limited liability company in Florida, although it purports to operate from 820 Aviation Drive, New Bern, Craven County, North Carolina.

13. D2 Government Solutions, LLC ("D2"), is a North Carolina limited liability company with a principal office in New Bern, Craven County, North Carolina.

14. Darryl Centanni ("Centanni") is President of TFSI, Onvoi, and D2, and, upon information and belief, maintains residences in New Bern, Craven County, North Carolina and Santa Rosa Beach, Florida.

15. David Ricker ("Ricker") is Chief Executive Officer of TFSI, Onvoi, and D2, and upon information and belief, resides in Conway, Arkansas.

16. Wally Calabrese ("Calabrese") was Dean of Craven's Havelock-Cherry Point campus (the "Havelock Campus") and was an agent and representative of Craven; Calabrese now works for D2.

17. The Trustees of Craven Community College ("Craven"), is a North Carolina community college organized as part of the North Carolina Community College System and existing pursuant to Chapter 115D of the North Carolina General Statutes with campuses in Craven County, North Carolina.

18. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this case arises from a federal question.

4

19. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of these events or omissions giving rise to Plaintiffs' claims occurred in this District and Defendants do business in this District and Craven is in this District.

20. Venue is proper pursuant to N.C. Gen. Stat. § 115D-58.12(b), as this suit is brought in a court of competent jurisdiction in Craven's administrative area.

### III. FACTUAL ALLEGATIONS

### A. Background

21. Plaintiffs reallege and incorporate by reference all preceding paragraphs of the Complaint as if fully set forth herein.

22. Since 2004, Craven has offered an Aviation Systems Technology Program on its Havelock-Cherry Point campus (the "Havelock Campus").

23. On October 24, 2017, Craven voted to approve a new Associate in Applied Science ("AAS") degree program known as the Aviation Management and Career Pilot Technology program ("AMCP").

24. Craven's program was designed to last five semesters with students obtaining the following FAA certifications after each semester:

     a. Private Pilot;

     b. Instrumental Pilot;

     c. Commercial Pilot;

5

d. Multi-Engine Pilot; and

e. Commercial Flight Instructor.

25. Craven's AMCP program was also designed so that students needed only 1,250 post-degree flight hours for airline certification.

26. When Craven approved the AMCP program, it planned to partner with Tradewind Aviation International, LLC ("TAI"), a private flight school.

27. At the time Craven approved the AMCP program, it was aware TAI lacked accreditation and resources to run a FAA approved degree program.

28. On May 21, 2018, the North Carolina Community College System ("NCCCS") approved Craven's curriculum application for the AMCP program with an effective term of Spring 2019.

29. By letter dated November 27, 2018, from the Southern Association of Colleges and Schools ("SACS") agreed to Craven, SACS agreed to approve the AAS and AMCP program and to include it in the scope of SACS's current accreditation of Craven (the "Accreditation Decision").

30. SACS based the Accreditation Decision on Craven's representations that:

a. All flight time would be conducted at Tradewind Aviation International, LLC;

b. Eleven (11) credit hours (15% of the total program credit) would be instructed at Tradewind Aviation International, LLC; and

6

c. Learning outcomes would be aligned with the FAA curriculum, outcomes, assessments, and benchmarks.

31. Craven did not sign a contract with TAI to provide services for the AMCP program.

32. Upon information and belief, TFSI was formed when TAI merged with a subsidiary of

33.

34. in January 2019.

35. According to TFSI's website, TFSI was purchased by D2 Government Solutions in January 2019.

36. Craven signed a contract with TFSI on July 31, 2019, for TFSI to provide Craven's students "Training Services" in accordance with FAA Part 141, FAR (the "Training Services Agreement").

37. The Training Services Agreement is attached as Exhibit A.

38. The Training Services Agreement is signed by "Mr. Dave Ricker, CEO Onvoi (TFSI)."

39. Defendants began publicly advertising the AMCP program in January 2019.

40. When advertising the AMCP program, Defendants specifically and falsely misrepresented to Plaintiffs that the AMCP program was an approved FAA Part 141 program that was R-ATP eligible.

7

41. Craven published an article in its 2019 Craven Community College Magazine, which states: "[d]ue to the partnerships with TAI and ONVOI Global Services, the AMCP program will be recognized as a Restricted Airline Transport Pilot (R-ATP) program, allowing graduates to earn an airline or cargo pilot position with less than the federal mandate of 1,500 total flight hours."

42. Calabrese is quoted in the January 16, 2019, article as stating that the R-ATP program "lowers the amount of flight hours to 1,250 with an associate in applied science degree or 1,000 with the BS in Aviation management degree."

43. Calabrese also stated: "[t]his adds up to enormous savings for the student and having to spend less time accumulating hours means entering the job market sooner."

44. The same article containing these statements from Calabrese was posted on Craven's website on or about January 16, 2019.

45. In the 2020 Craven Community College Magazine, Craven published an article about the AMCP program noting that the two-year program started in the fall 2019 semester.

46. The 2020 magazine article states: "[s]ince Craven CC is a two-year institution, the FAA reduces the total flight time program graduates must achieve, so students will qualify for the Airline Transport Pilot Exam at 1,250 flight hours."

8

47. On or about August 2020, TFSI posted on its website the following statement by Centanni celebrating TFSI's partnership with Craven: "[y]ou would be hard pressed to find any community college in the US that has an FAA approved 141 and VA program that is a public private partnership."

48. The statement on TFSI's website goes on to quote Centanni as follows: "[t]his is a unique program that streamlines the learning process allowing future pilots to earn their degree and license in two years. . . . The graduate will leave the program with 300 hours of flight time [...]."

49. Centanni's statements are intended to give the impression that the "public private partnership" between Craven and TFSI allows students to participate in an approved FAA Part 141 program that is R-ATP eligible.

50. When Defendants made these statements, not one of them had been certified by the FAA to provide a Part 141degree program that is R-ATP eligible.

51. Defendants intentionally misrepresented the program's FAA certification to Plaintiffs to induce their enrollment in the program.

52. All Plaintiffs enrolled in the AMCP program for the fall 2019 semester, except Plaintiff Kabengele who enrolled for the fall 2020 semester.

53. In August 2020, Defendants knew or should have known Plaintiffs were spending time and money in the AMCP to earn an R-ATP without knowing the AMCP program was not R-ATP eligible.

9

54. At the time of enrollment, not one of the Defendants explained to Plaintiffs or other AMCP students that the AMCP program did not have the appropriate Part 141 certification from the FAA to make the program R-ATP eligible.

55. At the time of enrollment, not one of the Defendants explained to Plaintiffs or other AMCP students that the Part 141 and R-ATP certification from the FAA was pending, under review, or otherwise in process.

56. In January 2020, Calabrese hosted a meeting for Plaintiffs and their classmates advising them to quit their jobs if they had them so that the students could devote 100% of their time and attention to the AMCP program.

57. During this meeting, Calabrese did not inform Plaintiffs that the FAA had not approved the Part 141 degree program with R-ATP eligibility.

58. As a result of this meeting, Plaintiffs quit jobs or chose not to pursue employment, as further described herein.

59. Due to the COVID pandemic, Craven cancelled some classes during the spring semester and TFSI's fight school closed for a short period of time.

60. When TFSI reopened, TFSI and Craven failed to ensure there were appropriate COVID protocols to ensure flight students were safe.

61. For example, TFSI did not trace close contacts within the Craven program when it was reported an instructor or student was diagnosed with COVID or COVID-like symptoms.

62. TFSI did not enforce quarantines when it was aware an instructor had COVID or COVID-like symptoms.

63. In May 2020, Defendants told Plaintiffs that the program could be condensed so that Plaintiffs could still meet their anticipated graduation date of May 2021.

64. In May 2020, not one of the Defendants informed Plaintiffs that the FAA had not yet approved the Part 141 program with R-ATP eligibility.

65. Craven conducted an annual review of the program in summer of 2020.

66. Upon information and belief, Craven's annual review of the program failed to identify the R-ATP eligibility concern.

67. At the conclusion of Craven's 2020 annual review, not one of the Defendants informed Plaintiffs that the FAA had not approved the Part 141 program with R-ATP eligibility.

68. As part of the 2020 annual review, Plaintiffs and their classmates were asked to evaluate the AMCP program.

69. The student evaluations disclosed concerns about safety, aircraft maintenance, and problems scheduling suitable aircraft for required flights.

70. In September 2020, TFSI issues Standard Operating Procedures ("SOP") for AMCP program students, including Plaintiffs.

71. Prior to September 2020, TFSI did not publish SOP to Craven students.

11

72. The SOP caused confusion about flight lessons, times, and flight requirements.

73. The SOP referenced outdated aircraft and an old company name, indicating it was not carefully considered for the needs of the Craven AMCP program.

74. Upon information and belief, the SOP were issued in retaliation for student complaints about safety, aircraft maintenance, and scheduling problems.

75. The SOP were not tailored to the needs or demands of the AMCP program and they interfered with Plaintiffs' progression in the AMCP program.

76. The SOP was intended to harass Plaintiffs and make it more difficult for them to log flight hours.

77. Upon information and belief, TFSI and Craven wanted Plaintiffs to become discouraged with the program so they would drop out before discovering the program's failure to secure R-ATP eligibility through Part 141.

78. Plaintiffs reported their concerns about the SOP to Calabrese, Program Director Mark Marsteller ("Director Marsteller"), and an instructor named Bill Franchie ("Franchie").

79. Following the report of SOP concerns, Plaintiffs experienced and/or witnessed harassment from TFSI employees as further detailed herein.

80. Plaintiffs reported the harassment they witnessed and/or experienced to Craven.

81. Upon information and belief, Defendants allowed the harassment and difficult conditions to continue so that Plaintiffs would drop out of the program before discovering the program's failure to secure R-ATP eligibility through Part 141.

82. In October 2020, Plaintiffs and their classmates arranged a student walk-out to peacefully protest the safety conditions, SOP changes, and harassment.

83. Franchie was aware of the walk-out and helped students, including Plaintiffs, draft a formal letter to Craven. A copy of the letter that was sent to Craven is attached hereto as Exhibit B (the "Student Grievance Letter").

84. Franchie agreed with students that the conditions at TFSI were unsafe.

85. According to the FAA, the pilot in command has the final authority on airworthiness of aircraft and assumes responsibility for the aircraft if he flies it.

86. All the Plaintiffs named herein had concerns about the airworthiness of TFSI's aircraft during his participation in the AMCP.

87. Some of the Plaintiffs continued to fly TFSI aircraft despite their concerns because they knew of no other way to accomplish their education and career goals and they were willing to assume the risk.

88. On October 13, 2020, a rumor began to circulate that the AMCP program was not a certified FAA Part 141 program with R-ATP eligibility.

13

89. On October 16, 2020, Calabrese emailed students to have them attend a meeting that same day regarding the AMCP program.

90. Plaintiffs attended the meeting, which included Dean Calabrese, Craven Vice President of Instruction Kathleen Gallman ("Gallman"), Director Marsteller, and representatives of TFSI.

91. During the October 16, 2020 meeting, students were told they were the reason the program was "behind."

92. During this meeting and at other times, students were told the SOP were created because of their complaints.

93. During the October 16, 2020 meeting, Gallman told students they were required to fly any airplane they were told to fly, disregarding student safety concerns.

94. No one explained to Plaintiffs on October 16, 2020 that the program was not Part 141 certified and that students will not be able to earn a R-ATP.

95. On November 12, 2020, Plaintiffs participated in a group meeting with Craven officials to discuss the Student Grievance Letter.

96. Some students also participated in induvial meetings with Craven officials on the same day.

97. The November 12, 2020 meetings did not resolve Plaintiffs' concerns about program safety and the SOP.

14

98. During the November 12, 2020 meetings, Craven officials again failed to inform students that they would not be able to earn a R-ATP.

99. After misinforming students about the status of the program on November 12, 2020, Craven pressured students to decide if they would remain enrolled in the AMCP program.

100. On or about December 1, 2020, Plaintiffs meet with an "independent" panel convened by Craven to discuss problems with the AMCP program and to try to resolve the issues raised by Plaintiffs and their classmates in the Walkout Letter.

101. Director Marsteller spoke on behalf of Plaintiffs and their classmates to validate their concerns about the AMCP program; Director Marsteller was suspended the next day.

102. Plaintiffs' concerns were not resolved by the independent panel.

103. Upon information and belief, TFSI made changes to its paperwork and maintenance books to cover up discrepancies and violations reported by Plaintiffs.

104. Despite TFSI's efforts to cover up discrepancies and violations, Plaintiffs witnessed numerous safety issues related to aircraft maintenance.

105. After multiple complaints and meetings with Craven and TFSI that did not resolve their issues, Plaintiffs realized it would be futile to continue to pursue any administrative remedies through Craven.

15

106.    In February 2021, Craven sent a letter containing the following statement to each plaintiff named herein:

> When we welcomed the College's first Aviation Management & Career Pilot (AMCP) students, the College believe that the Restricted Privileges Airline Transport Pilot (R-ATP) certification would be available for program graduates. At that time, the College understood that our contract with Tradewind Flight Services Inc (TFSI) would allow the College to certify its graduates for R-ATP eligibility. Unfortunately, the College learned after classes began that Federal Aviation Administration (FAA) regulations did not allow the College to rely on TFSI's certification by the FAA.

107.    Upon information and belief, Plaintiffs will never be eligible for R-ATP certification from any institution or flight school because they started the R-ATP process at Craven.

108.    Upon information and belief, Calabrese was forced to resign from the program in February 2021 and is now working for TFSI and/or D2.

109.    Defendants' actions have caused Plaintiffs extreme financial hardship as further detailed herein.

110.    Defendants' actions have caused Plaintiffs to suffer mentally and emotionally as further detailed herein.

111.    Plaintiffs, as further detailed herein, are veterans and in some cases already suffered mentally and emotionally as a result of their honorable service to the United States of America.

16

112.     As pilots seeking a career in aviation, Plaintiffs must take care to maintain good mental and emotional health since medical regulations list certain medical conditions as specifically disqualifying a person from flying.

113.     Some of the Plaintiffs, as detailed herein, were issued medical certificates and clearance by the FAA to fly under special issuance authorizations.

114.     The stress brought about by Defendants' actions could cause one or more Plaintiffs to lose their special issuance authorization.

### b. Allegations as to Plaintiff Arnold

115.     Plaintiffs reallege and incorporate by reference all preceding paragraphs of the Complaint as if fully set forth herein.

116.     Arnold was a corrections officer from 2014 until 2018.

117.     Arnold is 33 years old.

118.     Arnold holds an Associate's Degree in marine technology from Cape Fear Community college.

119.     Arnold has flown under a special issuance authorization ("SIA") in the past.

120.     The condition(s) for which Arnold received the SIA have been exacerbated by Defendants' actions.

121.     Arnold had a private pilot's license before coming into the Craven program.

17

122.     Arnold chose to participate in the program after reading a brochure advertising that Craven was certified by the FAA run a Part 141 program that would result in students earning a R-ATP.

123.     Arnold would not have enrolled if he had known the AMCP was not certified as a Part 141 program.

124.     During Arnold's first semester in the program, he was able to continue working at his full-time job.

125.     After the meeting in January 2020 when students were told to quit their jobs, Arnold quit his full-time job which paid $35,000 a year plus benefits.

126.     Arnold would not have quit his job if he had known the AMCP was not certified by the FAA as a Part 141 program.

127.     Arnold incurred more than $50,000 of student loan debt and interest as a result of his participation in the R-ATP program.

128.     Arnold chose to stop flying any TFSI aircraft on or about October 11, 2020 due to concerns about airworthiness of TFSI aircraft.

129.     Arnold met with school officials individually on November 12, 2020 to talk about his request that Craven reimburse him for student loan debt related to AMCP or otherwise work with the state to help forgive his loans.

130.     Arnold was told there was no use engaging in further discussion because Craven "can't give you what you want."

18

131.     During this meeting, Craven officials acknowledged to Arnold that there would likely be a lawsuit for what has occurred with the program.

132.     On December 12, 2020, Arnold met with Craven officials to receive an update on the safety issues, R-ATP, and other concerns Plaintiffs had raised.

133.     At the December 12 meeting, Arnold was introduced to Ben Hancock ("Hancock") who was described as an independent party hired by Craven to help get the program back on track.

134.     Hancock detailed his investigation into Plaintiffs' safety concerns and said the FAA had investigated the concerns, reviewed TFSI records, and did not substantiate any of the concerns in the Student Grievance Letter.

135.     Hancock said the students needed to get used to the "real world."

136.     Arnold reiterated his safety concerns and gave specific details of problems he had witnessed that the FAA could not known about just by reviewing TFSI records.

137.     During the same December 12, 2020 meeting, Gallman acknowledged to Arnold that the AMCP program was operating without Part 141 certification from the FAA.

138.     Gallman stated to Arnold that the Part 141 certification was "pending" so Craven did not have it "as of today."

139.     Gallman stated "we felt very positive yesterday speaking to the FAA" and that "there is a way forward with the R-ATP," or words to that effect.

140.     Gallman stated: "I can't tell you what the college would do if we were not awarded the R-ATP, but that is something we know we need to address," or words to that effect.

141.     Arnold was told during the meeting that student complaints were the "holdup" for the Part 141 certification.

142.     Hancock stated that the FAA sees a way ahead to the R-ATP expressed optimism that they would get "certification of the program" if things go well and after a site visit.

143.     At the end of the meeting, Gallman encouraged Arnold to take an incomplete for the semester so he could continue the program and have a chance at eventually obtaining his R-ATP, although she stated that there was "no guarantee" that the certification would come through.

144.     Arnold shared the information from this meeting with Plaintiffs.

**b. Allegations as to Plaintiff Broner**

145.      Plaintiffs reallege and incorporate by reference all preceding paragraphs of the Complaint as if fully set forth herein.

146.     Broner is 23 years old.

20

147.     Broner served in the Marines and first learned about the AMCP program when he was at Marine Corps Air Station at Cherry Point.

148.     Broner already had a private pilots license when he started the AMCP program during the spring semester of 2020.

149.     Like the other Plaintiffs, Broner joined the AMCP program because he believed it would allow him to earn his R-ATP.

150.     Broner chose to forego his acceptance to Thomas Edison University so that he could attend the AMCP program, believing it would cost him less money and allow him to reach his career goals on a shorter timeline.

151.     While enrolled in the AMCP program, Broner was pressured into flying unsafe aircraft in order to meet class schedule timelines.

152.     On one occasion, Broner was flying at night and his aircraft flaps were stuck in the down position during takeoff.

153.     Due to the malfunctioning flaps, Broner's aircraft came dangerously close to colliding with the tree-line at the end of the runway.

154.     Broner later learned that the flaps had malfunctioned for other students, that the malfunction was reported to TFSI, and that TFSI did not take reasonable, appropriate measures to address the malfunctioning equipment or to take the aircraft out of services.

155. Like other Plaintiffs, Broner has suffered financial and emotional harm as a result of Defendants' fraudulent and tortious actions.

156. Broner spent his savings and took out a loan so that he could pursue the AMCP, and now he does not have enough money to finish a Part 61 program.

### c. Allegations as to Plaintiff Clement

157. Plaintiffs reallege and incorporate by reference all preceding paragraphs of the Complaint as if fully set forth herein.

158. Clement served in the Army from 2006 to 2017.

159. Clement joined the army as a 15T UH-60 Blackhawk Helicopter Repairer. On Jun 03 2007 Clement finished his flight training and became a UH-60 Crew Chief. On September 06 2012 Clement became a Flight Instructor. In 2014 Clement became maintenance lead for a medivac flight unit.

160. Clement was responsible for 15 aircraft and for a 6-month period a total of 30 aircraft during the transition from the UH-60L to the UH-60M. Clement left the Army with a total of 1892.6 flight hours. 1120.6 of those hours were in combat.

161. Clement is 35 years old.

162. Clement has a 60% combined disability rating.

163.     Clement believes he has experienced more stress, depression and anxiety as a result of the actions taken by Defendants, as described herein than he experienced during 27 months in Iraq doing Air Assault missions or flying medevac missions in Honduras.

164.     Prior to Clement enrolling, Craven represented to him that the AMCP was approved by the Veterans Administration ("VA").

165.     Statements to this effect (i.e. that the program is "VA Approved") appears in the false advertising previously referenced.

166.      In fact, the AMCP did not gain VA approval for more than a year after Clement enrolled.

167.     Base on Craven's false representations about VA Approval, Clement decided to use his Post- 9/11 GI Bill (Chapter 33) Benefit Program ("GI Bill") to pay for his participation in AMCP.

168.     Clement transferred to Craven from the Part 141 program at Liberty University solely for the purpose of using his VA benefits.

169.     Clement had already paid $10,000 to Liberty University for his private pilot's license when he transferred to Craven.

170.     Clement's VA benefits did not take effect until he was more than a year into the Craven program, which caused him severe stress and financial hardship.

23

171.    Once approved, the GI Bill covered all Clement's costs except the private pilot portion of the program.

172.    Clement did not pursue separate employment when he was experiencing financial hardship because he was told by Craven he was not allowed to work while in the AMCP.

173.    Clement sincerely believed if he worked while in the AMCP he would be kicked out of the program.

174.    Clement has experienced severe depression and anxiety due to Defendants' actions.

### d. Allegations as to Plaintiff DeBatt

175.    Plaintiffs reallege and incorporate by reference all preceding paragraphs of the Complaint as if fully set forth herein.

176.    DeBatt served in the Marines from 2011 to 2019.

177.    DeBatt served in the infantry.

178.    DeBatt is 28 years old.

179.    DeBatt has a 100% disability rating from his time in the military.

180.    Two of the condition(s) for which DeBatt received the disability rating have been exacerbated by Defendants' actions (i.e. anxiety disorder and insomnia).

24

181.     In 2019, prior to DeBatt enrolling, DeBatt attended an informational meeting at which he was told by Craven representatives that the AMCP was approved by the FAA as a Part 141 program and the VA.

182.     DeBatt also reviewed and relied on publications stating the program was approved by the FAA and the VA.

183.     Based on these false representations, DeBatt decided to use his Post-9/11 GI Bill (Chapter 33) Benefit Program ("GI Bill") to pay for his participation in AMCP.

184.     Craven was not approved for VA benefits, however, so DeBatt did not receive his benefits.

185.     In the middle of DeBatt's second semester DeBatt was told by Craven that he had to pay $2,000 immediately or else he would be kicked out of the program.

186.     DeBatt made the payment expecting he would eventually be repaid when his benefits were approved.

187.     DeBatt's VA benefits did not take effect until he was more than a year into the Craven program, which caused him severe stress and financial hardship.

188.     Only a portion of DeBatt's costs for the first semester were offset by the GI Bill, so he has incurred financial aid debt for his first semester.

189.     Despite his financial distress, DeBatt did not get a job while enrolled in AMCP because he believed he would be kicked out of the program if he got a job.

190.     DeBatt was told on more than one occasion by Craven officials that AMCP students are not allowed to have jobs.

191.     When COVID prompted many businesses to close, DeBatt became aware of a sign in front of Tradewind stating "Business is Closing Due to COVID" or something to that effect.

192.     Upon information and belief, Defendant Centanni blamed DeBatt for the sign, but DeBatt was not responsible for the sign.

193.     Defendant Centanni called DeBatt the following weekend and berated him with statements to the effect of: "you fucking students are pieces of shit!" and "you guys are trying to fuck me out of $1.3M for this program!".

194.     Defendant Centanni harassed DeBatt and threatened to "ruin his career in aviation."

195.     DeBatt filed a grievance with Craven due to Centanni's harassment.

196.     Craven told DeBatt his grievance was not substantiated.

197.     Gallman called DeBatt and told him something to the effect of: "your grievance is real, and we know he did it, but there is nothing we can do for you or to him."

198.     After DeBatt filed the grievance Defendant Centanni left him alone, however, these events were distracting, upsetting, time-consuming, and interfered with DeBatt's participation in the program.

### e. Allegations as to Plaintiff Eubanks

199.     Plaintiffs reallege and incorporate by reference all preceding paragraphs of the Complaint as if fully set forth herein.

200.     Eubanks is 21 years old.

201.     Prior to enrolling in AMCP at Craven, Eubanks was pursuing his Airline Transport Pilot ("ATP") certificate directly from TFSI in the Part 61 program.

202.     TFSI told Eubanks about the AMCP program through Craven, and encouraged Eubanks to make the change so that he could earn the R-ATP and begin his career as a pilot sooner.

203.     The Part 141 program is more expensive than the Part 61 program.

204.     Eubanks enrolled in the AMCP program through Craven as a result of the false statements made by Defendants.

205.     Eubanks borrowed money from his parents to pay for the AMCP program.

206.     Eubanks paid full tuition in cash.

207.     Now that Eubanks is unable to complete his R-ATP at Craven, he has transferred to Dylan Aviation and is once again pursuing his ATP in a Part 61 program.

208.     Eubanks wasted time and money by transferring to the Craven program based on false promises that he would be able to earn a R-ATP certificate.

### f. Allegations as to Plaintiff Kabengele

209.     Plaintiffs reallege and incorporate by reference all preceding paragraphs of the Complaint as if fully set forth herein.

210.     Kabengele served in the Marines from 2016 until 2020.

211.     While in the Marines, Kabengele worked on the Harrier II AV-8B aircraft. Kabengele worked on the airframe of the aircraft and specialized in the ejection process and aviator life support.

212.     Kabengele is 29 years old.

213.     While in the military, Kabengele was treated for depression and anxiety.

214.     Kabengele has an associate's degree in auto mechanics.

215.     Unlike other Plaintiffs in this action, Kabengele was in the second cohort of students to enroll in the AMCP at Craven.

216.     Kabengele was introduced to the AMCP from an electronic mail solicitation from Onvoi (now TFSI).

28

217.     Kabengele arranged an introductory flight at TFSI where he was told more about the AMCP.

218.     After the introductory flight, Kabengele was deployed. He returned from deployment July 15, 2019.

219.     On August 30, 2019, Kabengele received a targeted email from Onvoi enclosing a Craven press release regarding the AMCP program. The press release is dated August 30, 2019, and contains the same false claims about the R-ATP as previously pled.

220.     After returning from deployment in July 2019 Kabengele met with Calabrese and Director Marsteller to discuss enrollment in the program.

221.     Kabengele was aware there were student complaints about SOP and timeline for program completion, and he asked if the problems were resolved.

222.     Calabrese and Director Marsteller assured Kabengele that the program "would be fine" by the time Kabengele started in August 2020.

223.     Defendants did not inform Kabengele that TFSI and Craven were not certified by the FAA as a Part 141 program with R-ATP eligibility.

224.     Defendants did not inform Kabengele that he could not earn an R-ATP by participating in the program.

225.     Defendants did not inform Kabengele that the R-ATP program would not be approved by the FAA.

226.     Kabengele already had an associate's degree; the only reason he enrolled in the AMCP was to earn the R-ATP.

227.     Defendants specifically misrepresented to Kabengele the program's certifications for the purpose of encouraging Kabengele to enroll.

228.     Kabengele moved his family from Boston, Massachusetts to Havelock, North Carolina.

229.     Kabengele was the legal guardian for his younger sister, so he was forced to move her to North Carolina with him and his fiancée.

230.     Kabengele paid out of pocket for the AMCP because he is saving his VA benefits for further education.

231.     Kabengele has experienced significant depression and anxiety since participating in the AMCP.

232.      While living in Havelock, Kabengele and his fiancée attended Annunciation Catholic Parrish where they participated in pre-marital counseling.

233.     Calabrese is a Deacon at Annunciation Catholic Parrish.

234.     Defendant Centanni also attends Annunciation Catholic Parrish.

235.     Calabrese was assigned to provide pre-marital counseling to Kabengele and his fiancée.

236.     Calabrese was aware of the stress and anxiety Kabengele was experiencing because of his participation in the AMCP.

237.     Kabengele spoke to Calabrese during counseling sessions about his concerns regarding the safety of TFSI's aircraft.

238.     Kabengele told Calabrese he was afraid to fly in the planes because they were so poorly maintained.

239.     Calabrese told Kabengele the planes were fine to fly, but Kabengele had good reason not to believe Calabrese.

240.     Kabengele and his fiancée were shocked by Calabrese's callous disregarded these safety concerns during counseling sessions.

241.     Calabrese took advantage of his position as a Deacon and counselor to pressure Kabengele to come to church and to participate in pre-marital counselling.

242.     Calabrese made comments to the effect of "if you're not coming to church or coming to the meetings, you might not be a good fit for the aviation program."

243.     Calabrese also used his position as a Deacon and counselor to tell Kabengele believe he might not succeed in the aviation program due to "poor communication" with his fiancée.

244.     Kabengele's fiancée felt uncomfortable with Calabrese's comments and shared this with Kabengele. Kabengele also felt Calabrese's statements were an abuse of his authority.

245.     Calabrese unethically and inappropriately blurred the lines between Dean and Deacon, and by doing so caused Kabengele and his fiancée to feel confused and uncomfortable.

246.     Although Calabrese was well-aware of the stress Kabengele was already experiencing, he never told Kabengele that the program was not eligible for R-ATP certification.

247.     As his counselor, Calabrese had a special duty to Kabengele to tell him the truth and to protect him from further harm.

248.     Upon information and belief, Calabrese shared information he learned during Kabengele's pre-marital counselling sessions with other Defendants.

249.     D2 claims Kabengele owes money for flight lessons, but Kabengele paid Craven for his flight time.

250.     Kabengele made the life-altering decision to move to Havelock based on the false and fraudulent representation detailed herein.

251.     Kabengele uprooted his family and moved from Massachusetts to North Carolina to obtain his R-ATP at great financial and emotional cost.

252.     Now, due to Defendants' actions, Kabengele cannot receive his R-ATP.

**g. Allegations as to Plaintiff Lambert**

32

253.	Plaintiffs reallege and incorporate by reference all preceding paragraphs of the Complaint as if fully set forth herein.

254.	Lambert served in the Army National Guard from 2006 to 2017.

255.	Lambert left the Army National Guard as a Guard Staff Sergeant with over 11 years' experience in electronics, avionics, aircraft power train components, and sub-components of aircraft including OH-58A-D (Kiowa), CH-47 (Chinook), and UH60A-60M (Black Hawk). Lambert was the back-shops supervisor and acting Platoon Sergeant during his last assignment, where he was responsible for more than sixty soldiers and over $3 Million Dollars of equipment.

256.	Lambert is 38 years old.

257.	Prior to Lambert enrolling, Craven represented to him that the AMCP was approved by the Veterans Administration ("VA").

258.	Statements to this effect (i.e. that the program is "VA Approved") appears in the false advertising previously referenced.

259.	In fact, the AMCP did not gain VA approval for more than a year after Lambert enrolled.

260.	Base on Craven's false representations about VA Approval, Lambert decided to use his Chapter 31 Veterans Readiness and Employment Program benefits ("Voc-Rehab") benefits to support his enrollment in AMCP at Craven.

33

261.     Voc-Rehab benefits are for veterans with severe service-connected disabilities.

262.     Voc-Rehab benefits are designed to improve a veteran's ability to live as independently as possible.

263.     Lambert suffers from Post-Traumatic Stress Disorder ("PTSD").

264.     On or about November 14, 2020, Lambert contracted COVID from his TFSI flight instructor.

265.     Lambert would not have contracted COVID from his flight instructor if Defendants had followed CDC and North Carolina COVID guidelines.

266.     As a result of contracting COVID, Lambert was quarantined for fourteen (14) days.

267.      On December 10, 2020, Lambert met with Gallman about the program and asked for a written guarantee that the AMCP program could provide a R-ATP certification.

268.     In December 2020, Gallman did not inform Lambert that he would not eventually be able to receive the R-ATP certification as advertised.

269.     Lambert was told his complaints would be heard by an appeals committee on January 15, 2021, and that he would be joined by teleconference; Lambert was never connected to the appeals committee meeting.

270.     On January 18, 2021, Lambert met with Franchie. During this meeting, Franchie acknowledged that there were a number of problems with the TFSI program.

271.     During this meeting, Franchie told Lambert that "things are going to happen in the next couple of months that are going to be out of your control."

272.     Franchie also told Lambert "things are going to become a lot more transparent coming up here."

273.     Although it seems Franchie knew at the time the R-ATP would not be available to Craven students, he did not specifically share this information with Lambert.

274.     Franchie also admitted to Lambert during this meeting that Craven did not have a "plan B" to deal with disruptions in the flight program, even though Franchie had advised Gallman that the program needed a plan B.

275.     Lambert has since learned from former Director Marsteller that Craven was trying to terminate Lambert from the AMCP program because he was "causing waves."

276.     Lambert continued to fly with TFSI until March 25, 2021, when he completed his commercial check ride.

277.     Lambert chose to continue to fly because his flight hours were prepaid through his VA benefits and he could not afford to forfeit those benefits.

35

278.     Lambert continued to witness maintenance concerns with TFSI aircraft through March 2021.

279.     Lambert paid $650 out of pocket for his commercial flight and exam while other students had theirs paid by Craven.

280.     Lambert forfeited a guaranteed state income of $1,700/month, sold his home and spent his savings so that he could move to Newbern and participate in the AMCP program to secure his R-ATP. Lambert spent his savings so that he could participate in the AMCP program and did not take another job because he was told not to.

281.     Over the last two years, Lambert has been treated for increased anxiety resulting from Defendants' fraudulent and tortious actions.

### h. Allegations as to Plaintiff Marsteller

282.      Plaintiffs reallege and incorporate by reference all preceding paragraphs of the Complaint as if fully set forth herein.

283.     Marsteller is 32 years old.

284.     Prior to enrolling in AMCP program, Marsteller worked in construction.

36

285.     Marsteller decided to join the Craven program based on his understanding that the program was a Part 141 program that would result in R-ATP certification.

286.     Marsteller's farther is "Director Marsteller" referenced herein.

287.     Director Marsteller was not involved in the creation of the AMCP program or partnership with Tradewind.

288.     Director Marsteller took over the program after the partnership was formed between TFSI and Craven, after the contract was signed, and after brochures advertising the program had been published and distributed.

289.     Director Marsteller was told the program was a certified Part 141 program and he believed, at the time he took over the program, that this was true.

290.     When taking over the program, Director Marsteller had no reason to doubt it was FAA certified as a Part 141 program.

291.     Marsteller relied on his father's statements about the program, and he also relied on representations made by Defendants that the program was a certified Part 141 program.

292.     Marsteller reviewed the program brochure that advertised the FAA-approved Part 141 program that would result in R-ATP certification.

293.     But-for his expectation of earning the R-ATP certification, Marsteller would not have enrolled in the AMCP program.

37

294.    But-for his expectation of earning the R-ATP certification, Marsteller would not have taken out private student loans to pay for the program.

295.    Marsteller has incurred substantial student loan debt due to his enrollment in the AMCP program.

296.    When students began reporting concerns about the program, Marsteller and others discussed the concerns with Director Marsteller.

297.    Director Marsteller acknowledged the students' concerns and reported them to Calabrese.

298.    When the concerns were not addressed by Craven, Director Marsteller filed a complaint with the FAA.

299.    Director Marsteller filed his complaint on or about August 20, 2020.

300.    Gallman was extremely upset about the FAA complaint.

301.    Sometime after he filed the FAA complaint, Gallman informed Director Marsteller that the FAA would not grant the program the Part 141 certification unless everything was "smoothed over."

302.    This was the first time Director Marsteller understood that the AMCP program did not have Part 141 certification from the FAA.

303.    Director Marsteller was extremely concerned on behalf of the students, including his own son.

304.    Director Marsteller advocated on behalf of the students, including his son, and was dismissed on December 10, 2020 in retaliation for his advocacy and whistleblowing.

305.    Marsteller was singled-out and harassed by Defendants because his father, Director Marsteller, made a report to the FAA.

306.    Marsteller was told by another student that the Chief Flight Instructor was not allowing Marsteller to do his stage exams and progress to the next level because "he hates your dad."

307.    Marsteller was regularly (intentionally) left off of the flight schedule so that he was not able to earn hours.

308.    At one point in time, Marsteller waited approximately six weeks between flights when other students were able to fly without as much interruption.

309.    Marsteller was also harassed and mistreated for reporting concerns that the students' flight hours would not count for the Part 141 program based a discussion he had with a Designated Pilot Examiner ("DPE").

310.    The DPE warned Marsteller that certifications could be pulled if the flight hours were not earned in accordance with Part 141.

311.    Masteller's concerns were not taken seriously.

312.    Calabrese told Marsteller that if he would just record his flight hours differently and not say anything about it, then the DPE wouldn't know.

39

313. Marsteller refused to falsify his flight log.

314. Marsteller currently has no funds to pursue a Part 61 ATP certification.

315. All of the time and expense invested at Craven was wasted.

## IV. FIRST CLAIM FOR RELIEF
### Violation of N.C. Gen. Stat. § 75-1.1 75

316. Plaintiffs reallege and incorporate by reference all preceding paragraphs of the Complaint as if fully set forth herein.

317. N.C. Gen. Stat. § 75-1.1 makes unlawful "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce."

318. The misrepresentations made by Defendants constitute a violation of G.S. § 75-1.1 in that such actions were against the established public policy of the State of North Carolina, were in or affecting commerce in North Carolina, and were unfair, misleading, deceptive, unethical, oppressive, unscrupulous, and/or substantially injurious to the students who enrolled, or re-enrolled, in Craven and TFSI for the fall 2020 semester.

319. The misrepresentations made by Defendants had the capacity and tendency to deceive the prospective and current students into believing that Craven and TFSI were in compliance with multiple FAA regulations, when Defendants

40

knew that none of them held Part 141 certification. These material

misrepresentations were contrary to the principles and obligations of good faith

and fair dealing which Plaintiffs were owed and had a right to expect.

320.    Defendants' misrepresentations were unfair, deceptive, unethical, and

substantially injurious to Plaintiffs.

321.    The actions and misrepresentations alleged above were committed

and made willfully by Defendants and were made from a desire to profit from

tuition and fees of current and prospective students.

322.    Defendants made affirmative material misrepresentations with the

intent that Plaintiffs would rely upon Defendants' material misrepresentations and

failures to disclose the true nature of their noncompliance with various FAA

standards and regulations.

323.    Defendants' material misrepresentations possessed the tendency

and/or capacity to deceive and mislead or create the likelihood of deception to

Plaintiffs.

324.    Defendants profited substantially from tuition and fees paid by

Plaintiffs for a program that Defendants knew or should have known would never

lead to an R-ATP certification.

325.     As a direct and proximate result of these unfair and deceptive misrepresentations, Plaintiffs have been damaged and are entitled to recover treble damages as well as attorneys' fees and costs, pursuant to N.C. Gen. Stat. § 75-16.

326.     Craven has waived its sovereign immunity to the extent it has purchased liability insurance pursuant to N.C. Gen. Stat. § 115D-58.12(a).

## V. SECOND CLAIM FOR RELIEF
### Unjust Enrichment

327.     Plaintiffs reallege and incorporate by reference all preceding paragraphs of the Complaint as if fully set forth herein.

328.     Defendants were unjustly enriched as a direct result of the misrepresentations made to Plaintiffs and their concealments.

329.     Upon information and belief, Craven and TFSI discussed the negative consequences for enrollment were either of them to inform current and prospective students of their failure to secure FAA Part 141 certification.

330.     As a direct result of Defendants' material misrepresentations, Defendants realized a financial benefit by denying current and enrolling students the opportunity to make an informed decision prior to enrolling at Craven or TFSI, and by collecting tuition and fees from Plaintiffs or student loan institutions paying on Plaintiff's behalf.

42

331.     It would be inequitable and unjust for Defendants to retain such ill-gotten gains, which Defendants have received because of their misconduct and material misrepresentations and concealments.

332.     The unjust enrichment of Defendants has caused economic damage to Plaintiffs.

333.     Defendants are liable for the return of tuition and fees paid by Plaintiffs for the AMCP program.

334.     Plaintiffs are entitled to money damages from Defendants on account of Defendants' unjust enrichment through unscrupulous and unfair practices.

## VI. THIRD CLAIM FOR RELIEF
### Breach of Fiduciary Duty

335.     Plaintiffs reallege and incorporate by reference all preceding paragraphs of the Complaint as if fully set forth herein.

336.     Upon information and belief, by entering into its Program Participation Agreement, and recouping the advantages of becoming a participating institution in the Title IV programs, Craven and its officers and employees agreed to comply with all conditions and requirements of Title IV of the Higher Education Act of 1965.

337.     Upon information and belief, by accepting Title IV funds, Craven and its officers and employees also accepted and agreed to accept fiduciary responsibility in the administration of Title IV programs.

338.     At all relevant times, a fiduciary relationship existed between Craven and Craven's officers and employees and both current and perspective Craven students, including Plaintiffs.

339.     As a fiduciary, Craven and Craven's officers were responsible for acting with the highest standard of care and diligence related to administration of Title IV programs. This fiduciary responsibility included the prohibition against substantial misrepresentations by Craven and Craven's officers and employees.

340.     Pursuant to 34 C.F.R. § 668.71(c), a "substantial misrepresentation" is defined as "any misrepresentation on which the person to whom it was made could reasonably be expected to rely, or has reasonably relied, to that person's detriment."

341.     Pursuant to 34 C.F.R. § 668.71(b), and according to the DOE, "substantial misrepresentations include misrepresentations made by the institution itself, or one of its representatives, regarding the nature of the institution's academic programs or the employability of its graduates."

342.     Pursuant to 34 C.F.R. § 668.71(a) and (g), and according to the DOE, "substantial misrepresentations involving the nature of an institution's education

44

program include misrepresentations concerning the 'nature and extent' of the institution's accreditation and the 'availability, frequency, and appropriateness of its courses and programs to the employment objectives that it states its programs are designed to meet.'"

343. Defendants' material misrepresentations outlined herein constituted substantial misrepresentations within the meaning of DOE's regulations.

344. Defendants misrepresented to Plaintiffs the nature and extent of the AMCP program's accreditation and FAA certification.

345. Defendants misrepresented to Plaintiffs the appropriateness of its courses and programs to the employment objectives that it states its programs are designed to meet.

346. Defendants' misrepresentations outlined herein constituted a breach of the fiduciary duty owed by Defendants to Plaintiffs.

347. Plaintiffs reasonably relied on the substantial misrepresentations made by Defendants outlined herein, and that reliance proximately caused Plaintiffs substantial pecuniary damages.

348. Craven has waived its sovereign immunity to the extent it has purchased liability insurance pursuant to N.C. Gen. Stat. § 115D-58.12(a).

## VII. FOURTH CLAIM FOR RELIEF
### Constructive Fraud

45

349.     Plaintiffs reallege and incorporate by reference all preceding paragraphs of the Complaint as if fully set forth herein.

350.     Defendants maintained a relationship of trust and confidence with Plaintiffs.

351.     Defendants took advantage of their position of trust, and made substantial misrepresentations to current and prospective students, in order to realize financial benefit from the tuition and fees paid by current and prospective students.

352.     Due to Defendants' position of trust, Plaintiffs relied on Defendants' misrepresentations to their detriment.

353.     As a direct and proximate result of Defendants' actions and misrepresentations, Plaintiffs suffered substantial pecuniary damages.

## VIII. FIFTH CLAIM FOR RELIEF
### Breach of Contract (Third Party Beneficiary)

354.     Plaintiffs reallege and incorporate by reference all preceding paragraphs of the Complaint as if fully set forth herein.

355.     Craven entered into the Training Agreement with TFSI, Onvoi, and/or D2.

356.     Upon information and belief, the Training Agreement is a valid contract.

46

357. As students in the AMCP program, Plaintiffs were intended third-party beneficiaries of the Training Agreement.

358. TFSI (and/or Onvoi and/or D2) breached the Training Agreement by failing to provide a FAA Part 141 complaint program.

359. Craven failed to notify Plaintiffs of the breach.

360. Plaintiffs suffered substantial pecuniary damages as a result of Defendants breach of the Training Agreement.

361. Craven waives sovereign immunity for an action on breach of contract when it enters into a contractual obligation.

## IX. SIXTH CLAIM FOR RELIEF
### Breach of Contract

362. Plaintiffs reallege and incorporate by reference all preceding paragraphs of the Complaint as if fully set forth herein.

363. Craven entered into an enforceable contract with Plaintiffs when it offered and Plaintiffs accepted enrollment in an AAS and AMCP program culminating in an R-ATP certification.

364. Craven failed to provide Plaintiffs an AAS and AMCP program culminating in an R-ATP certification.

365. Craven's actions constitute breach of an educational contract as recognized under North Carolina law.

47

366.     Craven waives sovereign immunity for an action on breach of contract when it enters into a contractual obligation.

## X. SEVENTH CLAIM FOR RELIEF
### Negligent Infliction of Emotional Distress

123.     Plaintiffs reallege and incorporate by reference all preceding paragraphs of the Complaint as if fully set forth herein.

124.     Defendants engaged in extreme and outrageous conduct and actions by luring veterans into their program with the promise that the program was approved by the VA and certified by the FAA to provide a Part 141 program.

125.     Defendants engaged in extreme and outrageous conduct and actions by endangering Plaintiffs and then blaming Plaintiffs for causing the program not to be approved.

126.     Defendants engaged in this conduct knowing that one or more of the Plaintiffs suffered from mental and emotional conditions that would reasonably be exacerbated by the stress of being defrauded.

127.     Defendants negligently engaged in this conduct.

128.     Defendants could and should have foreseen through the exercise of ordinary care that their extreme and outrageous actions would cause Plaintiffs severe emotional distress.

48

129.     Defendants were negligent in exercising ordinary care in numerous respects, not limited to Craven's failure to verity the Part 141 certification existed, Craven and TFSI's failure to take seriously student complaints, Craven and TFSI's failure to verify VA approval for the program existed, Defendants' failure to properly hire, retain, manage, monitor and supervise the individuals who perpetuated the outrageous conduct and actions committed against Plaintiffs.

130.     As a direct and proximate result of the Defendants' negligence and failure to exercise ordinary care, Plaintiffs have suffered tremendous emotional distress, mental anguish, embarrassment, and other damages associated with Defendants' actions.

131.     These injuries will likely cause Plaintiffs to suffer long-term and could disqualify one or more Plaintiffs from piloting planes in the future.

132.     Craven has waived its sovereign immunity to the extent it has purchased liability insurance pursuant to N.C. Gen. Stat. § 115D-58.12(a).

## XI.  EIGHTH CLAIM FOR RELIEF
### Breach of Implied Contract of Good Faith and Fair Dealing

133.     Plaintiffs reallege and incorporate by reference all preceding paragraphs of the Complaint as if fully set forth herein.

49

134.     Craven entered into enforceable contracts with Plaintiffs when it offered and Plaintiffs accepted enrollment in an AAS and AMCP program culminating in an R-ATP certification.

135.     Craven had an implied duty to act in good faith in the performance of the contracts and to make reasonable efforts to perform its obligations under the agreement. Craven had a duty to do everything its contracts with Plaintiffs presupposed it would do to accomplish its purpose.

136.     Craven breached its duties to Plaintiffs by making false representations to them, including untrue representations regarding R-ATP certification of the programs and compliance with multiple FAA regulations.

137.     These material misrepresentations breached Craven's obligations of good faith and fair dealing which Plaintiffs were owed and had a right to expect.

## XII. NINETH CLAIM FOR RELIEF
### Fraud in the Inducement

138.     Plaintiffs reallege and incorporate by reference all preceding paragraphs of the Complaint as if fully set forth herein.

139.     One or more Defendants made false representations to Plaintiffs and/or concealed material facts from them.

140.     For example, Defendants concealed their noncompliance with FAA regulations and certifications to operate a pilot training program in accordance with FAA Part 141

141.     These false representations and/or concealment of material facts was intended to deceive Plaintiffs.

142.     These false representations and/or concealment of material facts did, in fact, deceive Plaintiffs.

143.     As a result of the false representations and/or concealment of material facts, Plaintiffs were injured, as described in this Complaint.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs request the following relief:

1. That Plaintiffs have and recover compensatory damages in an amount in excess of Twenty-Five Thousand Dollars ($25,000) each;

2. That Plaintiffs each have and recover punitive damages for aggravated, willful, malicious, and wanton conduct for such amounts as proof at trial may show under their individual counts for relief set forth in this complaint;

3. That the Court treble all compensatory damages and award attorneys' fees pursuant to N.C. Gen. Stat. § 75-1.1 and N.C. Gen. Stat. Chapter 75D; and

4. That the Court award such other additional relief as may be appropriate under the circumstances.

This, the 2nd day of July, 2021.

Respectfully submitted,

/s/ Allison Tomberlin
Allison Tomberlin
State Bar No. 37114
Attorney for Plaintiffs
Beechler Tomberlin, PLLC
380 Knollwood Street, Suite 305
Winston-Salem, NC  27103
Telephone: (336)723-1110
E-mail: ali@beechlerlaw.com